## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| **PATRICIA AMMERMAN, NANCY SCHUETTE, MICHAEL DEGERATY, and JOHN REID SULLIVAN,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | **Civil Action No:** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **KEISHA PERRY WALKER, and THE PERRY LAW GROUP, LLC,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Comes now the Plaintiffs, Patricia Ammerman (hereinafter "Ammerman"), Nancy M. Schuette ("Schuette"), Michael Lee Degeraty ("Degeraty"), and John Reid Sullivan ("Sullivan") (collectively, the "Plaintiffs"), through undersigned counsel hereby sue Keisha Perry Walker (hereinafter, "Walker"), in her individual capacity and in her professional capacity as an attorney, and The Perry Law Group, LLC ("Perry Law Group"), and state as follows:

## PARTIES

1.    Plaintiff Patricia Ammerman is an adult citizen domiciled in Potomac, Montgomery County, Maryland. Walker assisted the wire fraud ring by using her IOLTA account to receive $335,000 of Patricia Ammerman's money. Walker

knowingly facilitated the scheme to defraud Ammerman out of $1.26 million, for the purpose of enriching herself wrongfully to Ammerman's loss and detriment.

2.    Plaintiff Nancy M. Schuette is an adult citizen residing in Marshfield, Wood County, Wisconsin. On May 10, 2022, Schuette was induced to wire $250,000 of her funds to an account controlled by the fraudulent enterprise described herein. She is a victim of the scheme orchestrated by Defendant Walker and her associates, as detailed below, and has suffered damages exceeding $250,000.

3.    Plaintiff Michael Lee Degeraty is an adult citizen domiciled in Happy Valley, Clackamas County, Oregon. In July 2022, Degeraty (through a family trust for which he is trustee) wired $50,000 to Defendant Walker's law firm trust account in Georgia as part of what he was told was a legitimate investment; in fact, this money was misappropriated by Defendant and her cohorts. Degeraty has suffered damages of at least $50,000, as well as additional consequential losses.

4.    Plaintiff John Reid Sullivan is an individual residing in Southbury, New Haven County, Connecticut.  On or about July 6, 2022, Sullivan wired $50,000 of his funds to the fraud scheme under the assurance that his money would be safely held and invested with substantial returns. Sullivan was directly communicated with and assured by Defendant Walker who knew or should have known that Sullivan was being defrauded out of his money.

5.      Defendant Keisha Perry Walker is an attorney and resident of

Georgia, with a principal business address at 2 Ravinia Drive, Suite 1260, Atlanta,

GA 30346. At all relevant times, Defendant Walker was a licensed attorney

operating through her law firm, The Perry Law Group, LLC, in Atlanta. Defendant

Walker participated in and facilitated the fraudulent scheme described in this

Complaint by leveraging her status as an attorney and acting as an escrow

agent/paymaster for the scheme's transactions.

6.      Walker used her law firm's Interest on Lawyers' Trust Account

(IOLTA) to receive and disburse victim funds under false pretenses, personally

drafted fraudulent documents to authorize release of victims' money, and

communicated with victims via interstate wires to lend credibility to the scheme

and to assuage their concerns. At all times, Walker acted for her own financial gain

and in concert with other known and unknown co-schemers.

7.      At all times pertinent to this complaint Walker acted with intent to

deceive and defraud, with actual malice, evil intent, and acted willfully for the

purpose of harming Plaintiffs arbitrarily such that it shocks the conscience.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over the federal claim in

this action pursuant to 28 U.S.C. § 1331, as Plaintiffs assert a claim under the

Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et*

*seq.* (Count I). The Court has supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy.

9.     The Court has general in personam jurisdiction over Keisha Perry Walker and The Perry Law Group LLC because they are domiciled in the State of Georgia.

10.    Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b) because both Defendants reside in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District. Defendant Keisha Perry Walker is an attorney domiciled in Atlanta, Georgia, and at all relevant times she conducted the fraudulent activities described herein from within this District. The interstate communications and wire transfers at issue were directed to and from this District, and Defendant's actions in Georgia caused injury to Plaintiffs in multiple other states.

11.    The activities of the Defendant Walker and her associates, as described below, affected interstate commerce. The fraudulent scheme involved interstate wire communications (emails, phone calls, and electronic messaging including Keisha Perry Walker's direct emails to fraudulently induce victims to send the wire fraud ring money through her IOLTA account) and the interstate transfer of funds across state lines (including wire transfers from Plaintiffs in

Wisconsin, Arizona, Connecticut, and the District of Columbia to accounts in Georgia and elsewhere).

## INTRODUCTION

12.    This case concerns a Georgia lawyer, Keisha Perry Walker ("Walker"), and her firm, The Perry Law Group, LLC ("Perry Law Group"), who used the imprimatur of an attorney escrow/IOLTA account to induce, receive, and release Plaintiffs' money to fraud promoters, despite repeated red flags and direct written warnings from victims themselves.[1] Walker (a) had Plaintiffs wire funds into her firm's IOLTA account, (b) drafted and procured "release" language authorizing her to take disbursement instructions from the fraud's ringleader, and (c) when questioned, insisted she could not provide information without that ringleader's permission—all while acknowledging she knew of his securities-fraud history and continuing anyway.

13.    The proof is clearly documented. Exhibit 1 shows Plaintiff Nancy Schuette's $250,000 wire to The Perry Law Group IOLTA (May 10, 2022). Exhibit 2 is the "Request and Authorization to Release Funds" Walker used to move Schuette's money to "Streamline" at the direction of Darrell Rideaux—a

---

[1] At all relevant times, Walker acted as an agent of Perry Law Group, within the scope of her employment and for the firm's benefit (including accepting "percentage" kickbacks), rendering Perry Law Group liable directly and vicariously (under the doctrines of respondeat superior and apparent authority) for Walker's torts.

notorious fraudster barred by FINRA and prosecuted by the SEC—and to take his disbursement instructions going forward. Exhibit 3 contains escrow instructions naming Perry Law Group as Escrow Agent with its wire coordinates. Exhibit 4 includes Walker's emails refusing to provide information to Schuette absent Rideaux's permission and admitting she was aware of his 2018 FINRA sanctions—but continuing to act as "paymaster/escrow" anyway. Exhibit 6 contains bank records showing $335,000 from Ammerman's investment paid to The Perry Law Group in two wires (Dec. 27 and 30, 2021). (Ex. 6, pp. 7–12).

14.     These facts support Plaintiffs' claims—including RICO (18 U.S.C. § 1962(c)), fraud, breach of fiduciary duty, conversion, negligence/gross negligence, and unjust enrichment—against Walker and Perry Law Group. Walker conducted the affairs of an association-in-fact enterprise through a pattern of racketeering activity, and that the enterprise's activities affected interstate commerce.

## FACTS COMMON TO ALL COUNTS

### I.     Plaintiff Nancy M. Schuette

15.     In early May 2022, Defendant Keisha Perry Walker and The Perry Law Group, LLC ("Perry Law Group") positioned themselves as escrow/paymaster for a transaction involving Plaintiff Nancy M. Schuette. Walker's Escrow Instructions—dated May 7, 2022—expressly name The Perry Law Group, LLC as "Escrow Agent" and provide the firm's IOLTA wire

coordinates under a heading, "Wire Instructions Below." (Ex. 3, pp. 9–11).

16.     On May 10, 2022, in reliance on Walker's escrow posture, Schuette wired $250,000 directly to the "PERRY LAW GROUP LLC IOLTA ACCOUNT" at Wells Fargo. The Wells Fargo wire paperwork identifies the beneficiary as the Perry Law Group IOLTA, lists paymaster@theperrylawgroup.com

17.     At the time of the May 10, 2022 transfer, Nancy Schuette's $250,000 represented funds she earmarked to pay for her husband Jeffrey's necessary medical care, including ongoing specialist visits, procedures, and medications.

18.     By directing Schuette to place the money "IN TRUST" with The Perry Law Group's IOLTA, Walker induced Schuette to believe the funds would be safeguarded for that urgent medical purpose and not released or dissipated absent authorization.

19.     Schuette's funds had been intentionally set aside to support her husband's necessary medical care, and Walker's conduct deprived Schuette of the ability to provide for his health as planned.

20.     As a direct and proximate result, Nancy Schuette suffered and will continue to suffer severe emotional distress and mental anguish, both from the loss of her life savings and from the jeopardy to her husband's medically necessary care that those funds were intended to cover.

21.    Walker drafted and obtained from Schuette a one-page "REQUEST AND AUTHORIZATION TO RELEASE FUNDS," addressed to Keisha Perry Walker, Esq. The document directs the Firm to "immediately release 100% of the funds … to the benefit of Streamline Consulting Services, Inc.," and further authorizes "the Firm … to take written instructions from [Darrell] Rideaux ('Recipient') regarding the disbursement of the funds deposited in the Firm's Account." Schuette signed this authorization on May 10, 2022. (Ex. 2, p. 7).

22.    On information and belief, after procuring Schuette's signature on this "Release Authorization," Walker released Schuette's funds out of escrow to Streamline and/or as directed by Rideaux, thereby stripping the very safeguards that induced Schuette to wire to a lawyer's "trust" account. Walker's later admissions to another victim confirm her method and control: she acknowledged serving as "paymaster and escrow agent," stated she "handled the release of funds according to your instruction," and admitted she was "aware" of Rideaux's 2018 FINRA/securities matter—yet continued anyway. (Ex. 4, p. 17).

23.    When Schuette asked for basic wire details, Walker refused. In a September 22, 2022 email from PLG Paymaster, Walker wrote: "As you granted us permission to take direction from Mr. Rideaux on the disbursement of your funds, you essentially relinquished rights in your funds to his control. … I cannot provide the information without his permission." (Ex. 4, p. 13).

24.    No funds were returned. Despite the transfer being expressly labeled "IN TRUST" to the Perry Law Group IOLTA, Walker withheld transaction information unless Rideaux consented or a court ordered disclosure—while the money had already been released at his direction. Schuette has never recovered any portion of her $250,000. (Ex. 1, pp. 2–5; Ex. 4, p. 13).

25.    Taken together—the Escrow Instructions naming Perry Law Group as Escrow Agent, the wire to the firm's IOLTA marked "IN TRUST," the signed "100% release" authorization empowering Rideaux to dictate disbursements, and Walker's emails refusing transparency and admitting knowledge of Rideaux's FINRA bar—establish Walker's direct solicitation, receipt, and release of Schuette's funds, her control over the disbursement process, and knowing participation and in the alternative her willful indifference to obvious fraud warnings. (Exs. 1–4).

26.    As a member of the enterprise, Walker was aware of and benefitted from the misappropriation of Schuette's money. Walker's role in lending the scheme credibility as an attorney was a necessary component that gave victims like Schuette false confidence that their funds were safe.

27.    Schuette never received any of the promised returns on her "investment," nor was her principal returned. By the time she realized she had been defrauded, her $250,000 was long gone. The false assurances that her money was

secured and protected (including those given by Peterson referencing sham guarantees) were all part of the scheme to defraud. To the extent Schuette was provided any documents or notes (for example, any reference to a promissory note or collateral), those were fraudulent and intended only to placate her. (Indeed, co-conspirator Peterson falsely told another victim that a "Promissory Note" with *Gauntlet Holdings, LLC* guaranteed the return of principal; any such note provided to victims was illusory and never honored). Schuette suffered the loss of her $250,000 as a direct result of the scheme in which Defendant Walker was a knowing participant.

## II.    Plaintiffs Michael Lee Degeraty and John Reid Sullivan

### a.    Michael Lee Degeraty

28.    In mid-2022, promoters including Antonio "Tony" Marino and Craig Peterson pitched Plaintiff Michael Lee Degeraty on a "small-cap" trading program and introduced attorney Keisha Perry Walker to bolster credibility. Walker communicated with Degeraty by phone and email, holding herself and The Perry Law Group, LLC ("Perry Law Group") out as "paymaster and escrow agent" for the transaction and representing that funds placed into her IOLTA would be safeguarded and released only under agreed conditions. These representations were material to Degeraty's decision to proceed.

29.    On July 6, 2022, a single $100,000 wire was sent to Keisha Perry Walker's IOLTA, composed of $50,000 from Degeraty's trust and $50,000 from Sullivan. One year later, seeking to trace the funds, Degeraty wrote Walker on July 20, 2023 requesting "any and all information … about the $100,000.00 USD that my Trust sent to your firm on about July 6, 2022. The money was released to Streamline Consulting Solutions LLC – David Gibson." (Ex. 4, p. 15).

30.    Degeraty's $50,000 portion of the wire consisted of insurance proceeds received in connection with his wife's permanent neck injuries, sustained in a no-fault automobile accident. Those proceeds had been set aside to cover essential medical expenses, including physician visits, therapy, and related care for Degeraty's wife.

31.    By representing herself and The Perry Law Group as a "paymaster and escrow agent," and directing that Degeraty's funds be placed "IN TRUST" in the firm's IOLTA account, Walker induced Degeraty to believe the money would be securely held for that medical purpose and not released or dissipated without his authorization or agreed conditions. In doing so, Walker not only repeated and affirmed her co-conspirators' representations, but also personally assured Degeraty that the funds were safe, could not be lost, and would yield guaranteed returns. These assurances were false when made and were central to Degeraty's decision to entrust Walker and The Perry Law Group with the money he had reserved to care

for his wife.

32.    Walker's conversion and misappropriation of Degeraty's funds struck at the heart of his ability to care for his wife. The $50,000 in insurance proceeds had been deliberately set aside to support her recovery and long-term medical needs.

33.    Discovering that these funds had been misappropriated by Walker caused Degeraty profound distress, outrage, mortification, as he watched the resources he had reserved to care for his wife's permanent injuries vanish into the hands of someone he had entrusted with fiduciary responsibility.

34.    As a direct and proximate result of Walker's actions, Michael Lee Degeraty suffered severe emotional distress and mental anguish, not only from the financial loss itself, but from the deep personal injury of being unable to provide for his wife's medical care as he had planned. The betrayal, especially given the trust placed in an attorney purporting to act as an escrow agent, caused Degeraty feelings of humiliation, moral injury, and enduring emotional harm.

35.    As with Schuette, Walker drafted and procured a one-page "Release Authorization" that transferred "100%" of deposited funds to Streamline and authorized her Firm to "take written instructions" from Darrell Rideaux for disbursements—i.e., stripping the very escrow safeguards she had invoked to induce the wire. (Compare Ex. 2, p. 7 (Schuette form) with the Degeraty "Release

Authorization" (Id.) quoting the same operative language for Degeraty and Sullivan's $100,000).

36.     When Degeraty asked for records on July 20, 2023, Walker refused to provide information absent Rideaux's consent and copied Rideaux, directing Degeraty to "converse directly" with him—an extraordinary stance for an attorney who had received and released the client's funds from escrow. (Ex. 4).

37.     On July 21, 2023, after Degeraty forwarded a list of public materials detailing Rideaux's FINRA bar and fraud history, Walker answered: "yes I am aware of this," asserted "We serve as paymaster and escrow agent," and stated her Firm "handled the release of funds according to your instruction," while also claiming it performed "no due diligence." (Ex. 4, p. 17; see also p. 18 listing the materials Degeraty sent). These admissions directly confirm Walker's receipt and release of Degeraty's escrowed funds and her knowledge of Rideaux's history.

38.     On information and belief, Walker also kept Peterson apprised of the status of Degeraty's transaction by copying him on emails, further evidencing her active role in facilitating and monitoring the disposition of funds

39.     Degeraty has not been repaid any portion of his $50,000. Walker's admissions ("paymaster/escrow," "handled the release of funds …," "no due diligence," and awareness of the 2018 FINRA matter) establish scienter and her knowing participation in diverting investor principal to the promoter's control. (Ex.

4, p. 17).

### b.    John Reid Sullivan

40.    In early July 2022, using the same playbook, John Reid Sullivan was told his funds would be secured via Perry Law Group's escrow and then safely deployed. On or about July 6, 2022, Sullivan wired $50,000, which—on information and belief—Walker released in the same manner as with Degeraty: by pairing the purported escrow with a form "Release Authorization" that enabled immediate transfer to Streamline and allowed Rideaux to dictate downstream disbursements. Sullivan received neither the promised returns nor a refund. The identical escrow posture and Walker's email admissions described above corroborate this pattern.

41.    Sullivan's experience, occurring contemporaneously with the July 2022 Degeraty transaction and employing the same Perry Law Group IOLTA and release/disbursement structure, shows that Walker's misconduct was not isolated but part of a repeatable method to obtain and dissipate investor principal out of attorney escrow.

## III.    Plaintiff Patricia Ammerman

42.    In December 2021, Plaintiff Patricia Ammerman was steered into a supposed "trading program" that promised extraordinary returns and the use of an attorney escrow for safety. Attorney David L. Fisher positioned his IOLTA as the

initial receiver. Relying on those representations, Ammerman wired $1,000,000 on December 21, 2021, and, shortly thereafter, $126,000 on January 18, 2022, to Fisher's attorney trust account to be held for the investment and released only under stated conditions.

43.    Within days, large portions of Ammerman's principal were carved up and moved out to participants and entities associated with the scheme. Critically for this case, The Perry Law Group, LLC—Keisha Perry Walker's firm—received two wires totaling $335,000: $215,000 on December 27, 2021, and $120,000 on December 30, 2021. The wire statements reflect transfers "WT … The Perry Law Group LLC" corresponding to those dates and amounts. These payments were sourced from Ammerman's principal and were not exchanged for any legitimate legal service rendered to them. (See Exhibit 6, bank records).

44.    Plaintiff Patricia Ammerman was induced to wire a total of $1,126,000 in principal for the purported program. Although $335,000 of that principal was routed directly to The Perry Law Group, LLC within three days (Dec. 27 & 30, 2021), the documentary trail shows that all of her principal was carved up and dissipated through the same mechanism Walker enabled. (Bank and wire records attached; see Ex. 6.)

45.    The same Telegram thread enumerates a disbursement list allocating investor principal to various recipients and entities (e.g., "Tony" (Marino), "SCS

BoA" (Streamline's Bank of America account), "Andre," "Gauntlet," "Weingold Erik," "Orion"), reflecting a coordinated plan to slice and move the money through a network of accounts. This context squarely fits Perry Law Group's receipt of $215,000 and $120,000 from Fisher's trust: the funds were not placed into an investment, but rapidly distributed out to participants—including Walker's firm. (Ex. 5 (pp. 24–25); Ex. 6 (pp. 33–35)).

46.    The Perry Law Group receipts—$335,000 within three days of Ammerman's initial deposit—occurred at the outset of the scheme's "carve-up," when no "investment" had been consummated and while insiders were preoccupied with bank verification hurdles. The timing, amounts, and records support a reasonable inference that Walker and her firm knowingly accepted investor principal as part of the distribution mechanism, not as payment for bona fide services to Ammerman. (Ex. 5; Ex. 6).

47.    Walker's escrow/paymaster role—soliciting, receiving, and releasing funds; drafting "release" language; and coordinating with the promoter—was a but-for and proximate cause of the loss of Ammerman's entire principal, rendering Walker and the firm liable for the full $1.26 million, not merely the $335,000 that reached the firm's IOLTA account.

48.    The pattern continued into January 2022 with the additional $126,000 wire from Ammerman to Fisher's IOLTA and further disbursements out to

associates and shells—again with no actual investment made for Plaintiffs' benefit.

49.     The documentary trail establishes that Walker proximately caused Ammerman's loss as a necessary intermediary to use her IOLTA account to facilitate the wire fraud ring's fraud proceeds: (i) bank records show $335,000 in wires from Fisher's trust to The Perry Law Group in December 2021; (ii) Telegram traffic documents contemporaneous balance checks, disbursement planning, and awareness of bank fraud controls surrounding the million-dollar receipt; and (iii) Walker's later email admissions (in 2023, to another victim) that she acted as "paymaster and escrow agent," "handled the release of funds according to your instruction," and was "aware" of Rideaux's 2018 FINRA/securities matter further evidence knowledge and modus operandi across victims. (Ex. 6; Ex. 5; Ex. 4, p. 17).

50.     Ammerman was never repaid any portion of their $1,126,000 principal, nor did they receive the promised "ten-times" return. They also incurred financing costs to raise the initial investment (including HELOC interest), compounding their losses.

51.     In sum, as to Patricia Ammerman, the documentary evidence shows:

        (a)     Receipt and control of her principal Keisha Perry Walker;

        (b)     Rapid, pre-planned disbursements of her money to insiders and entities (captured in Telegram messages reacting to the $1M

arrival and bank scrutiny); and

(c)     Two direct transfers to Walker's firm totaling $335,000 within

a three-day window—without any corresponding investment or

return to her. These facts support the claims against Walker and

The Perry Law Group for RICO predicate acts (wire fraud),

fraud, conversion, breach of fiduciary duty, negligence/gross

negligence, and unjust enrichment based on their knowing

participation in obtaining and dissipating the Patricia

Ammerman's funds. (Ex. 5; Ex. 6; see also Walker's later

admissions in Ex. 4 (p. 17)).

52.     In all of the above, Walker received kickbacks out of the fraud

proceedings obtained from Plaintiffs under false pretenses. Walker pocketed her

share from each wire transfer she received for her own enrichment knowing the

illicit nature of her pecuniary benefit and detriment it caused the schemes victims

including plaintiffs.

## IV.    CAUSES OF ACTION

### COUNT I
### RICO (18 U.S.C. § 1962(c); remedies under § 1964(c))

53.     Plaintiffs reincorporate by reference all preceding paragraphs as

though restated in full herein and further states as follows:

54.    Defendant Keisha Perry Walker and Defendant The Perry Law Group, LLC (together, "Defendants") are each a "person" within the meaning of 18 U.S.C. § 1961(3). Walker, Perry Law Group, and non-party participants—including Ken Phillips, Darrell Rideaux, Craig Peterson, Antonio "Tony" Marino, David L. Fisher, Erik Weingold, Todd Jackson, Andre Ester, and affiliated entities such as Streamline Consulting Services, Inc. ("Streamline")—formed an association-in-fact enterprise within the meaning of § 1961(4) (the "Enterprise"). The Enterprise functioned as a continuing unit with a common purpose: to obtain investor funds under false pretenses and divert them for personal enrichment.

55.    The Enterprise engaged in, and its activities affected, interstate commerce through interstate emails, phone calls, messaging applications, and wire transfers across state lines, as well as the use of attorney IOLTA accounts to receive and disburse funds originating from Wisconsin, Oregon/Arizona, Connecticut, Maryland, and the District of Columbia into and out of Georgia.

56.    Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Walker's role was willful and material: she solicited and received victim funds into her firm's IOLTA account, drafted and procured "Release Authorizations" that ceded control of escrowed funds to promoter Darrell Rideaux, and communicated with victims to lull, deflect, and

preserve the scheme's appearance of legitimacy. Perry Law Group, acting through Walker within the scope and for the benefit of the firm, likewise participated.

57.    Within ten years, Defendants committed multiple, related predicate acts under 18 U.S.C. § 1961(1), including:

(a)    Wire fraud (18 U.S.C. § 1343). By interstate email and phone, Walker: (i) induced Plaintiff Nancy Schuette to wire $250,000 to Perry Law Group's IOLTA on May 10, 2022 and procured a "100% release" authorization in favor of Streamline controlled by Rideaux; (ii) induced Plaintiff Michael Degeraty (through his trust) to wire $100,000 to the IOLTA on or about July 6, 2022 and later invoked "confidentiality" to refuse basic escrow information when he inquired on July 20, 2023; and (iii) admitted on July 21, 2023 that she knew of Rideaux's 2018 FINRA/securities sanctions while continuing to act as "paymaster/escrow" and stating that she "handled the release of funds according to your instruction."

(b)    Money laundering (18 U.S.C. § 1957). Defendants conducted monetary transactions exceeding $10,000 in criminally derived property, including the $215,000 (Dec. 27, 2021) and $120,000 (Dec. 30, 2021) transfers received by Perry Law Group from

Ammerman's escrowed principal, and the $100,000 transfer out of escrow for Degeraty's transaction.

(c)    Transportation/receipt of stolen property (18 U.S.C. §§ 2314, 2315). Defendants caused and/or received interstate transfers of funds known to be obtained by fraud, including $335,000 routed into Perry Law Group's accounts from Ammerman's principal in December 2021, and the movement of Degeraty's $100,000 from his trust to Georgia and then out to Enterprise participants.

(d)    Mail fraud (18 U.S.C. § 1341). On information and belief, and subject to discovery, certain agreements and executed "release" paperwork and related documents were transmitted by interstate carriers in furtherance of the scheme to defraud.

(e)    Honest-services fraud (18 U.S.C. §§ 1343, 1346). By holding herself out as an escrow/paymaster attorney, Walker deprived Plaintiffs of the intangible right to honest services by concealing kickback-style percentage payments to herself and the firm, secretly aligning with the promoter's interests, and making materially misleading omissions about conflicts of interest and the true disposition of escrowed funds—via

interstate wire communications.

58.     These predicate acts are related and continuous. They share the same purpose (to obtain and dissipate investor principal), methods (false "investment" promises, attorney-escrow fronts, Release Authorizations, and IOLTA disbursements), and participants (Walker, Perry Law Group, and the Enterprise's promoters), and span at least from December 2021 through July 2023, involving multiple victims (including Schuette, Degeraty, Sullivan, and Patricia Ammerman) and multiple transactions. They far exceed the two predicate acts required under § 1961(5).

59.     Plaintiffs were injured "by reason of" Defendants' RICO violations. A total of approximately $1,526,000 in principal was induced and then misappropriated via the wire transfers and Release Authorizations that constitute the racketeering acts, including $250,000 (Schuette), $100,000 (Degeraty), $50,000 (Sullivan), and $1,126,000 (Patricia Ammerman). The loss of this principal—and associated consequential damages—was the direct and proximate result of the scheme and the predicate acts.

60.     The RICO "persons" (Walker and Perry Law Group) are distinct from the Enterprise, which comprises multiple individuals and entities and exists separately from either Defendant. The Enterprise has an existence and structure independent of this litigation and of any one Defendant.

61.     Defendants acted with actual knowledge and willful intent. Walker's own admissions—acknowledging awareness of the 2018 FINRA matter; describing herself and the firm as "paymaster and escrow agent"; stating that the firm "handled the release of funds according to your instruction"; and disclaiming any due diligence—combined with the firm's direct receipt of $335,000 from Ammerman's principal, establish knowing and deliberate participation in the Enterprise's affairs.

62.     Under 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, costs, and reasonable attorneys' fees. Plaintiffs' actual damages are at least $1,526,000, for trebled economic damages of $4,578,000, plus appropriate equitable relief (including constructive trust, disgorgement, and equitable lien) consistent with RICO remedies.

**COUNT II**
**COMMON LAW FRAUD**

63.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

64.     Defendants; Perry Law Group is liable directly (use of firm email, letterhead, IOLTA) and vicariously under respondeat superior and apparent authority for Walker's acts within the scope and to the benefit of the firm.

65.     Defendants, through Walker, made material misrepresentations and omissions, including:

(a)    that Plaintiffs' funds would be safely held in escrow and
released only under stated conditions;

(b)    vouching for the legitimacy/trustworthiness of Rideaux and the
program;

(c)    drafting and procuring "Release Authorizations" that silently
stripped the promised safeguards and ceded control to Rideaux;

(d)    concealing Walker's and the firm's financial cut (including
instructions to keep a percentage), and conflicts of interest; and

(e)    lulling/deflection statements (e.g., "confidentiality" prevents
disclosure; the firm's dealings were "upstanding"; "not our
responsibility"), intended to delay discovery and thwart
recovery.

66.    Defendants knew these statements were false and/or acted with
reckless disregard for their truth. Walker admitted knowledge of Rideaux's FINRA
bar yet continued as paymaster/escrow; she acknowledged releasing funds
"according to your instruction" despite the only "instruction" being the form
release she drafted to transfer control to the promoter.

67.    Plaintiffs reasonably relied on Defendants' attorney-escrow
assurances and omissions in wiring funds and refraining from immediate protective
action. But for that reliance, Plaintiffs would not have sent the money or would

have demanded prompt return.

68.     Plaintiffs suffered at least $1,526,000 in out-of-pocket loss plus consequential damages (interest, tracing costs). Defendants' intentional, willful fraud warrants punitive damages (e.g., O.C.G.A. § 51-12-5.1).

## COUNT III
## BREACH OF FIDUCIARY DUTY

69.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

70.     By accepting Plaintiffs' funds into an attorney IOLTA and holding themselves out as "Escrow Agent/Paymaster," Defendants owed fiduciary duties of loyalty, candor, and due care (including compliance with IOLTA rules) to safeguard, use funds only for authorized purposes, avoid self-dealing/conflicts, and disclose material facts.

71.     Defendants breached these duties by: (a) releasing funds to third parties without conditions being met; (b) accepting and retaining $335,000 from Ammerman' principal for their own benefit; (c) concealing conflicts and the firm's "percentage" take; (d) ignoring glaring red flags and bank warnings; and (e) refusing to provide basic escrow information while aligning with the promoter's instructions.

72.     These breaches directly caused Plaintiffs' losses (e.g., Schuette's $250,000; Degeraty's $50,000; Sullivan's $50,000; Ammerman's $1,126,000),

plus consequential damages. Plaintiffs also seek punitive damages, disgorgement, and equitable relief (constructive trust/equitable lien on assets traceable to Plaintiffs' funds).

## COUNT IV
## CONVERSION

73.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

74.    Plaintiffs retained ownership or an immediate superior right of possession to the specific funds transferred for limited escrow purposes until conditions were satisfied (which never occurred).

75.    Defendants intentionally exercised unauthorized dominion over Plaintiffs' funds by: (a) releasing them to Streamline/Rideaux without authority or through consent obtained through fraud and deception; (b) retaining Ammerman principal ($335,000) for their own benefit; and (c) refusing return or transparency upon demand (e.g., Degeraty's July 20, 2023 request).

76.    Plaintiffs are entitled to the full value of the converted funds, pre-judgment interest from conversion dates (Dec. 2021; May 10, 2022; July 2022), punitive damages (malicious, fraudulent conversion), and equitable remedies (constructive trust, accounting).

## COUNT V
## NEGLIGENCE & GROSS NEGLIGENCE

77.    Plaintiffs reallege all preceding paragraphs as though restated in full herein and plead this count in the alternative to intentional tort and misrepresentation claims.

78.    Acting as attorney "escrow/paymaster," Defendants owed Plaintiffs a duty of ordinary care to receive, safeguard, track, and disburse funds lawfully and prudently; to refrain from facilitating known or reasonably knowable fraud; to suspend or withhold disbursements upon credible red flags; and to communicate material information bearing on the safety of funds held in PLG's IOLTA.

79.    Defendants failed to exercise reasonable care by accepting Plaintiffs' funds into PLG's IOLTA and agreeing to act as escrow/paymaster without conducting even minimal diligence on the purported investment or the promoter, and by disbursing those funds despite readily available red flags. Publicly available materials—widely disseminated articles and regulatory records identifying Darrell Rideaux's FINRA bar and fraud history—were independently discoverable with ordinary diligence; they were also transmitted to Walker by Degeraty before and after the transfers. Nevertheless, Walker accepted and routed hundreds of thousands of dollars to, or at the direction of, the promoter; failed to suspend activity or implement protective holds; failed to verify the legitimacy of the transaction; and, after being notified by Degeraty and Schuette that their principal

had not been returned for extended periods, disclaimed responsibility as a mere "paymaster," refused transparency, and took no remedial action. These acts and omissions constitute negligence and, given the sustained notice and disregard of obvious red flags, gross negligence (an entire want of care amounting to conscious indifference to consequences). On information and belief, Walker and/or PLG received fees or a percentage tied to releases to the promoter, further underscoring motive and conscious indifference.

80.    Had Defendants exercised ordinary care—including performing minimal due diligence before accepting and disbursing Plaintiffs' funds—Walker would have discovered readily available red flags (including publicly available records reflecting a FINRA bar and widely published warnings concerning the promoter, Darrell Rideaux) and would not have accepted or routed hundreds of thousands of dollars to him in the first place. Defendants' failure to vet, coupled with their acceptance and disbursement of funds to a known or reasonably knowable fraud actor, was a direct and proximate cause of Plaintiffs' losses; with ordinary care, the funds would not have been entrusted to, or released for the benefit of, the fraud scheme. Independently, the circumstances support an inference of negligence under res ipsa loquitur: entrusted client funds, under Defendants' control while held and disbursed from PLG's IOLTA, were funneled to a notorious fraudster—an outcome that ordinarily does not occur absent a failure

to exercise ordinary care by the escrow/paymaster.

81.     Plaintiffs entrusted funds to PLG's IOLTA in reliance on the attorney-escrow/paymaster structure and Defendants' role safeguarding those funds, including:

> (a)     Schuette wiring $250,000 to "PERRY LAW GROUP LLC IOLTA ACCOUNT," expressly "IN TRUST";
>
> (b)     Degeraty (through his trust) wiring $100,000 on July 6, 2022;
>
> (c)     Sullivan wiring $50,000 on or about July 6, 2022; and
>
> (d)     Patricia Ammerman deploying principal that, within days, saw $335,000 routed to The Perry Law Group, LLC consistent with the same mechanism Walker enabled.

82.     Schuette relied on the attorney-escrow/paymaster assurances and structure described above when wiring $250,000 "IN TRUST" to PLG's IOLTA and did not receive the return of principal.

83.     Degeraty relied on the same assurances when his trust wired $100,000 to PLG's IOLTA on July 6, 2022, and did not receive the return of principal.

84.     Sullivan relied on the same assurances when he wired $50,000 on or about July 6, 2022, and did not receive the return of principal.

85.     Patricia Ammerman relied on the attorney-escrow/paymaster structure to deploy her funds; within days of their transfer, $335,000 of their principal was

routed to The Perry Law Group, LLC, with no legitimate investment or return.

86.    As a proximate result of Defendants' breach of her duty of care owed to Plaintiffs they suffered pecuniary loss and related consequential damages.

87.    The specific principal losses include: (a) Schuette—$250,000; (b) Degeraty—$50,000; (c) Sullivan—$50,000; and (d) Patricia Ammerman—$1,126,000, including $335,000 routed to Keisha Walker within three days with no legitimate investment or return.

88.    Plaintiffs seek judgment for economic damages (principal losses identified above), consequential damages (including interest and tracing costs), costs of suit, and such other and further relief as permitted by law. Given the entire want of care alleged, Plaintiffs also seek punitive damages to the extent authorized for gross negligence on a finding of gross negligence.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

89.    Plaintiffs reallege all preceding paragraphs as though restated in full herein and plead this claim in the alternative to intentional torts.

90.    Defendants, acting as attorney "escrow/paymaster," undertook to supply information for the guidance of Plaintiffs in business transactions involving the transfer, safeguarding, and conditional release of funds. Walker issued escrow instructions naming The Perry Law Group, LLC as "Escrow Agent" with IOLTA wire coordinates and represented that funds placed "IN TRUST" would be

safeguarded and released only under agreed conditions.

91.    In providing those assurances, Defendants negligently supplied false or misleading information by representing that PLG would act as a neutral, safeguarding escrow while using PLG's IOLTA to facilitate disbursements as part of a fraudulent scheme that Walker knew—or, at minimum, should have known—was being directed by a notorious fraud actor. The red flags concerning Darrell Rideaux were widely published and readily discoverable with minimal diligence, and were also provided directly to Walker by Degeraty before and after the transfers. Nonetheless, Walker continued disbursements to (or at the direction of) the promoter without basic verification or suspension, later disclaiming responsibility as "paymaster" while refusing transparency or remedial steps.

92.    Plaintiffs justifiably relied on Defendants' escrow/paymaster statements and documents when deciding to wire funds to PLG's IOLTA and to forgo immediate protective measures, including:

> (a)    Schuette wiring $250,000 to "PERRY LAW GROUP LLC IOLTA ACCOUNT," expressly "IN TRUST";
>
> (b)    Degeraty (through his trust) wiring $100,000 to PLG's IOLTA on July 6, 2022;
>
> (c)    Sullivan wiring $50,000 on or about July 6, 2022; and

(d)    Patricia Ammerman deploying principal that, within days, saw $335,000 routed to The Perry Law Group, LLC.

93.    Plaintiffs suffered pecuniary loss proximately caused by that reliance, including: $250,000 (Schuette), $50,000 (Degeraty), $50,000 (Sullivan), and $1,126,000 (Patricia Ammerman), with bank records showing $335,000 routed to PLG within three days and no corresponding investment or return.

94.    Plaintiffs seek judgment for economic damages (principal losses identified above), consequential damages (including interest and tracing costs), costs of suit, and such other and further relief as permitted by law.

## COUNT VII
## UNJUST ENRICHMENT

95.    Plaintiffs reallege all preceding paragraphs as though restated in full herein.

96.    Defendants received and retained benefits traceable to Plaintiffs' funds, including at least $335,000 from Ammerman's principal and additional amounts tied to Schuette, Degeraty, and Sullivan, knowing the funds derived from investor principal and not from legitimate fees.

97.    Equity forbids Defendants from retaining those benefits; Plaintiffs never intended to confer them and received no value in return. Retention would unjustly enrich Defendants for wrongful conduct.

98.     Plaintiffs seek economic and compensatory damages, restitution, disgorgement and a constructive trust or equitable lien on all assets traceable to Plaintiffs' funds.

## RELIEF SOUGHT

99.     Wherefore, Plaintiffs demand a jury trial on all counts and, upon a verdict in their favor, request actual economic damages of $1,526,000 (to be trebled under 18 U.S.C. § 1964(c) to $4,578,000), non-economic compensatory damages of $2,500,000, punitive damages of $2,500,000, costs, reasonable attorneys' fees, constructive trust and equitable lien on assets traceable to Plaintiffs' funds, disgorgement, restitution, and all other relief to which they are entitled under federal and state law. Plaintiffs also seek leave of Court to freely amend this complaint in due course and to add co-Defendants upon proper cause and justification.

100.    Plaintiffs demand a trial by jury for all issues so triable.

Respectfully submitted, December 8, 2025:


                                        */s/ Andrew Coffman*
                                        Andrew Coffman
**PARKS, CHESIN & WALBERT PC**   Georgia Bar No. 173115
1355 Peachtree Street NE          acoffman@pcwlawfirm.com
Suite 2000
Atlanta, GA 30309
(404) 873-8000